Filed 6/24/14  Woodruff v. County of San Diego In-Home Supportive Services Public Authority CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DEBIE WOODRUFF et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>COUNTY OF SAN DIEGO IN-HOME SUPPORTIVE SERVICES PUBLIC AUTHORITY,<br><br>    Defendant and Respondent. | D062180<br><br><br>(Super. Ct. No. 37-2008-00096957-CU-OE-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald L. Styn and Lorna A. Alksne, Judges.  Affirmed in part; reversed in part.

Law Offices of David J. Gallo and David J. Gallo for Plaintiffs and Appellants.

Thomas E. Montgomery, County Counsel, and William H. Songer, Deputy County Counsel, for Defendant and Respondent.

I

INTRODUCTION

The In-Home Supportive Services (IHSS) program is a Medi-Cal based public assistance program that provides domestic, paramedical and personal care services to qualified aged, blind or disabled persons who cannot safely remain in their own homes without such services

(recipients). (Welf. & Inst. Code, §§ 12300, 12300.1.)[1] In San Diego County, the IHSS program is administered through a public entity (Public Authority). Its governing board is the San Diego County Board of Supervisors.

Debie Woodruff, Ollie Katrina Baptiste and Miriam St. Germaine[2] (collectively, Appellants) provided in-home supportive services to recipients through Public Authority. They initiated or joined a class action suit against Public Authority for unpaid wages and overtime under Labor Code section 1194, claiming that they, and members of their class, had not been paid for all hours worked and further claiming that they were entitled to hourly wages for time spent attending an orientation, completing a mandatory background check, and for noncommute work-related travel time. Appellants posited that they were not paid for all hours worked because Public Authority retroactively reduced the number of authorized hours if the recipient died before the end of the calendar month. When that happened, the provider was not paid for the hours that he or she had already worked in excess of the retroactively reduced hours. In addition, Public Authority capped the number of hours that a provider could work for a recipient in the first two weeks of a month at 60 percent of the total number of hours that were authorized for the month (60 percent rule). Appellants maintained that as a result of the retroactive application of this rule, they had not been paid for the full number of hours that they had worked.

Appellants contend that the trial court erred by sustaining Public Authority's demurrer to Appellants' claims for unpaid overtime wages on the ground that Public Authority, as a public

---

[1]    Unless otherwise specified, further statutory references are to the Welfare and Institutions Code.

[2]    The complaint was amended in 2011 to state the true names of Appellants Baptiste and St. Germaine.

2

entity, is exempt from subject wage and hour statutes and regulations; denying their requests for leave to amend the complaint to add claims for expenses for completing mandatory background checks; and granting Public Authority's motion for summary judgment on their claim for compensation for attending an orientation program. Appellants also assert that the trial court erroneously excluded evidence of a provider's travel time between recipients' homes and erred in instructing the jury concerning the definition of "authorized services."

We conclude that the trial court did not err when it determined that Public Authority is an employer of IHSS providers. However, the court erred as a matter of law when it determined that Public Authority is not subject to Labor Code section 510, which governs compensation for overtime hours, and Labor Code section 2802, which governs compensation for expenditures or losses incurred by an employee in direct consequence of the discharge of his or her duties, and therefore abused its discretion when it sustained Public Authority's demurrer without leave to amend to Appellants' claim for overtime wages and compensation for expenses incurred on behalf of a recipient.

We also conclude that the trial court did not err when it denied Appellants' motion for leave to file a claim for compensation and reimbursement for time spent and expenses incurred in completing mandatory background checks and reviewing written orientation materials as required under section 12301.24. Further, the trial court did not err in granting Public Authority's motion for summary adjudication on the issue of compensation for attending an orientation program, prior to the enactment of section 12301.24 (pre-2009 orientation), and in excluding evidence of Appellants' travel time between recipients' homes. However, the court erred in denying Appellants' request to amend the complaint to add a claim for compensation for attending an orientation and completing the enrollment process in person after the enactment of section

3

12301.24, which imposed this requirement only on prospective providers and not current providers.

Finally, we conclude that the trial court erred when it denied Appellants' request to instruct the jury that Appellants were entitled to be paid for every hour worked performing authorized services, including "wait time," and instead instructed the jury that Appellants were entitled to compensation only for the time spent actually performing authorized services. The instructional error is not harmless with respect to any unpaid hours claimed for attending to a dying recipient and those hours worked that were not paid because Public Authority retroactively reduced the recipient's approved hours. However, an "hours worked" instruction was not required for time that St. Germaine spent caring for a client's service dog because this is not an authorized service under the relevant IHSS statutes. Accordingly, we affirm in part and reverse in part.

II

FACTUAL AND PROCEDURAL BACKGROUND

In November 2008, Woodruff filed a class action complaint claiming that Public Authority engaged in systematic violations of applicable provisions of the Labor Code and wage orders issued by the California Industrial Welfare Commission (IWC). The complaint sought recovery of unpaid wages, including overtime compensation and payment of the minimum wage for all hours worked, plus prejudgment interest, attorney fees and costs. (Labor Code, § 1194.)

Public Authority demurred to the complaint on the grounds that it is not the plaintiffs' employer, and that even if it is their employer, as a public entity, it is immune from Labor Code and regulatory wage and overtime requirements. Woodruff filed a first amended complaint (FAC) that added allegations that when a recipient of IHSS died or otherwise became ineligible to receive in-home supportive services during the month, Public Authority would retroactively

4

reduce the number of authorized hours for that month and as a result, had not paid providers for all hours worked during those months. The amended complaint also alleged that Public Authority had not paid providers for overtime hours, as required under statutory and regulatory provisions, and had not paid providers the minimum wage for each hour worked, including for time spent in mandatory training and orientation, and traveling between work sites during the work day.

The trial court[3] ruled that Public Authority is Appellants' employer. However, the court sustained Public Authority's demurrer on Appellants' claims that Public Authority had violated statutory and regulatory requirements for overtime compensation, minimum wage and penalty wage requirements, and that its practice of retroactively prorating the recipient's eligible hours, without regard to the hours that the provider had already worked, violated applicable minimum wage laws.

The trial court certified the class as those persons who worked as providers of IHSS from November 26, 2005 to January 29, 2009, and who had been required to attend a training/orientation session in order to be listed as a provider on the IHSS registry (Registry) and were not compensated for attending the session.

In September 2010, Woodruff filed a motion for leave to file a second amended complaint (SAC) to add a claim seeking reimbursement from Public Authority for job-related expenses, including expenses incurred for fingerprinting and background checks, and also seeking payment of minimum wage for all hours worked. Woodruff also sought to add a claim for compensation and reimbursement for noncommute travel time, including time spent shopping or running

---

3    Judge Ronald Styn heard and ruled on Public Authority's demurrer.

5

errands for a recipient, and time spent accompanying and transporting a recipient to medical appointments. The court denied the motion for leave to amend.

In May 2011, the trial court granted Public Authority's motion for summary adjudication on the claim that it had violated minimum wage laws by not compensating providers for attending an orientation. This ruling disposed of the only claim for which the class had been certified.

A jury trial on the issue of whether Public Authority had paid minimum wage to the Appellants for all hours worked was held in March 2012.[4] Albert Sayles, the executive director of the Public Authority, testified that providers were paid for each authorized hour worked within the statutory limits. The county social worker assessed each recipient's needs and determined, on a task-by-task basis, the number of participant hours that would be authorized. Authorized tasks included meal preparation, respiration care, bathing, dressing, housekeeping, yard hazard abatement, bowel and bladder care, feeding, ambulation, and repositioning if bedridden. Services for companionship or sitting with a recipient were never authorized. Public Authority did not control the county social worker's assessment of the recipient's needs.

Sayles testified that whenever a recipient became ineligible for IHSS, whether by death, hospitalization, institutionalization, or other circumstances, the hours approved for the recipient for that month were automatically recalculated to reflect ineligibility for part of the month. Sayles acknowledged that it was possible that if a recipient passed away, the provider may have already worked more hours than were retroactively authorized. In that event, the county social worker had the authority to adjust the recipient's approved hours to authorize payment for all hours that the provider had actually worked for that recipient. If the social worker did not

_____

4     Judge Lorna Alksne presided at the trial.

approve the hours, Public Authority could not pay the provider for the hours worked in excess of the reduction in authorized hours.

Woodruff testified that when she sought employment as an IHSS provider in 2004, she attended an orientation, filled out a form for a background check and was fingerprinted. IHSS personnel told her that once she was approved, she would be placed on Public Authority's Registry and her name would be provided to IHSS recipients.[5]

In the summer of 2008, Woodruff was hired by the family of Lucille C.[6] Lucille was 97 years old and in failing health. She was living with her granddaughter, Adele C. Woodruff provided authorized in-home supportive services to Lucille, including meal preparation and cleanup, laundry, maintenance of her respiration equipment, treatment of bedsores, bowel and bladder care, and feeding, bathing, dressing and grooming.

The social worker authorized 143.6 hours of services for Lucille in September 2008. Woodruff worked 48 hours during the first pay period in September. When she received her paycheck, her time card stated that there were 95.6 authorized hours remaining for the second pay period in September. When a family member from out of state who had been helping with Lucille's care returned home, Adele, who worked full time, requested that Woodruff not leave Lucille alone during the day.

Woodruff testified that because Lucille had bed sores, she repositioned Lucille every half hour. Woodruff monitored Lucille's oxygen equipment and breathing, checked frequently for

---

[5]    Recipients have the right to hire providers of their choice. (§ 12301.6, subd. (c)(1).) Recipients may elect to receive services from IHSS personnel who are not referred to them by the public authority or nonprofit consortium. (*Id.*, subd. (h).)

[6]    To maintain confidentiality, we refer to recipients and their family members by their first names.

soiling, dampened Lucille's mouth, made smoothies and tried to feed her, kept her as hydrated as possible, changed her gowns, administered pain medications, and read to Lucille while sitting and monitoring Lucille's condition, trying to keep her comfortable. Lucille died on September 22.

Woodruff submitted a time card to Public Authority for 72 hours, stating that she had worked 12 hours a day for six days. She was paid for only 35 hours. The social worker told Woodruff that the number of authorized hours for September had been prorated according to the date of Lucille's death. Accordingly, Woodruff was paid for only 35 hours.

Lucille's granddaughter, Adele, testified that Woodruff cared for Lucille when no family member or hospice volunteers were available. Adele kept track of Woodruff's time. Her calendar notes showed that in the second half of September, Woodruff worked nine and a half hours on September 16, ten and a half hours on the 17th, eight and a half on the 18th, and five and a quarter hours on the 19th, for a total of 333/4 hours. Woodruff's time sheet showed that she had worked 12 hours every day from September 16 through 21. Adele acknowledged that she had signed Woodruff's time sheet for 72 hours, certifying that it was true, accurate and complete.

Ollie Katrina Baptiste testified that she worked for Raymond S. from 2007 to 2010. Baptiste assisted Raymond with cleaning, laundry, shopping, errands, personal care, and medical appointments. In June 2009, Baptiste worked 10 hours for Raymond but misplaced her time sheet. She personally delivered a replacement time sheet to the IHSS office. When Baptiste later inquired as to why she had not received payment, Public Authority told her that her time sheet had not been processed yet. They never told her that they did not have the time sheet. Baptiste was never paid for the 10 hours that she worked for Raymond in June 2009. In addition, when Raymond was admitted to the hospital, the social worker retroactively cut the hours that had been authorized for his care. As a result, Baptiste was not paid for 30 hours that she had worked.

8

Baptiste had another client, Roy K., who had suffered a stroke. She went to his home every day to make sure that he was eating. She took him to the Food Bank and tried to arrange Meals On Wheels for him. When Baptiste was not successful in obtaining additional services for Roy, she telephoned the social worker for help. According to Baptiste, the social worker did not appear to be interested. The social worker reduced the number of hours that Baptiste was authorized to work for Roy from 59 hours to nine hours per month. When Baptiste went to Roy's house to have him sign her time sheet, she found him on the floor in his underwear, covered in feces. Baptiste telephoned the social worker to inform her of Roy's condition. The social worker told Baptiste that Baptiste had been replaced by another provider. Baptiste had two time sheets for Roy for which she had not been paid because he went into assisted living and refused to sign a time sheet. The social worker would not authorize the hours and payroll was not allowed to process it. Baptiste testified that she was not paid for 10 hours in June 2009, 20 hours in March 2009, and 59 hours in May 2007. In addition, she was not paid for 10 hours (out of 20) that she had worked for a schizophrenic client, Mary P. The number of hours authorized for Mary's care was cut after Mary told the social worker that she was "fine." In all, Baptiste was not paid for 99 hours of in-home supportive services that she had provided to her clients.

Miriam St. Germaine testified that she worked for a client, Denny R., who was a quadriplegic. St. Germaine went to his house in the morning on a daily basis. She drained Denny's catheter, helped him exercise, made breakfast for him and ensured that he had lunch for the day. St. Germaine also fed Denny's service dog, Sage.

In June 2008, St. Germaine was authorized to work 50 hours a month for Denny. Denny's need for services increased significantly when his mother, who had been assisting with his care, became ill and another provider quit. St. Germaine submitted 42 hours for the first pay period in

June. She was paid for 29.5 hours. The social worker informed St. Germaine that a rule prohibited payment of more than 60 percent of the total authorized monthly hours in the first half of any month.

Toward the end of the month, Denny was admitted to the hospital for treatment of a chronic infection. He was scheduled to return home a few days later. St. Germaine prepared his home for his return. She also cared for Sage because there was no one else who could take the dog. Denny passed away unexpectedly while in the hospital. St. Germaine was instructed not to put the 11 hours that she had spent taking care of Sage on her time sheet, and she did not. She was paid for 80 of the 92.5 hours that she reported she had worked in June.

Meredith McCarthy, assistant director of Public Authority, testified that authorized hours were retroactively reduced after a recipient's death. She had no reason to believe that Woodruff had been informed of that policy. Public Authority did not pay providers for any hours that they may have worked in excess of 60 percent of hours authorized for any month during the first pay period of the month. Because of this rule, St. Germaine was not paid for 12.5 hours. McCarthy had no reason to believe that providers were informed of that policy. With respect to Baptiste's claim that she was not paid for the hours that she worked for Raymond in June 2009, McCarthy testified that Public Authority did not have any record of Baptiste's June 2009 time sheet.

Vickie Molzen, the IHSS program manager, testified that the 60 percent rule was a policy of the State of California that had been in effect for at least 18 years. It was the recipient's prerogative to schedule providers. Recipients were told to be careful in allocating their hours. Molzen acknowledged that recipients were frail and that their situations could decline. If that happened, the provider or the recipient should inform the social worker that the recipient needed more hours. The social worker was authorized to make an adjustment to the 60 percent rule using

10

a special transaction. However, hours worked in the first pay period of each month in excess of 60 percent of the total number of authorized hours for that month would not be paid unless the social worker had been informed in advance that the recipient had additional needs and had approved additional hours.

Ellen Schmeding oversaw IHSS and Adult Protective programs on behalf of San Diego County. Each recipient's hours were authorized on a monthly basis. If the social worker did not authorize hours in a particular service category, the recipient was not eligible to receive care in that category. Protective supervision services were authorized only for those recipients who had cognitive impairments. The recipient was responsible to schedule the provider's hours. Providers received notice of the recipient's monthly authorized hours on their time sheets. Most providers would realize that they could not work all of the authorized hours in the first part of the month. If the recipient passed away before signing a time sheet, the provider would not be paid unless the provider's work hours could be verified. A social worker could make an accommodation to pay the provider if the recipient died.

Janet Williams, the social worker with the San Diego County Health and Human Services Agency who had authorized 143.6 service hours for Lucille in June 2008, acknowledged that if a recipient needed additional care and then passed away, a provider might not be paid for all of the hours that the provider had worked for that recipient.

The trial court rejected Appellants' request to instruct the jury that Appellants were entitled to minimum wage for each hour that they had worked providing authorized services, including any waiting time. Instead, the trial court instructed the jury that "[o]nly those services that I have described as supportive services are authorized for payment through the IHSS program."

11

On a special verdict form, the jury was asked to decide whether each plaintiff had performed work for Public Authority. If the answer was "yes," the jury was to determine whether the plaintiff had been paid at least the minimum wage by Public Authority "for each hour worked performing authorized services." If the answer was "no," the jury was to determine the number of hours that the plaintiff had not been paid for authorized services.

The jury determined that each of the Appellants had performed work for Public Authority and that they had each been paid at least the minimum wage for each hour worked performing authorized services. The court entered judgment on the jury verdict in favor of Public Authority.

III

DISCUSSION

A.    Overview of the IHSS program

The IHSS program is designed to provide supportive services[7] to aged, blind, or disabled persons who are unable to perform the services themselves and who cannot safely remain in their

_____

[7]    Supportive services include domestic services, services related to domestic services, heavy cleaning, personal care services, assistance with medical appointments or visiting alternative resource sites, yard hazard abatement, protective supervision, teach and demonstration services and paramedical services. (§ 12300, subd. (b); § 14132.95, subd. (d)(1).) Ancillary services including meal preparation and cleanup, routine laundry, shopping for food and other necessities, and domestic services may also be provided as long as these ancillary services are subordinate to personal care services. (§ 14132.95, subd. (d)(2).)

Personal care services includes all of the following: assistance with ambulation; bathing, oral hygiene, and grooming; dressing; care and assistance with prosthetic devices; bowel, bladder, and menstrual care; repositioning, skin care, range of motion exercises, and transfers; feeding and assurance of adequate fluid intake; respiration; and assistance with self-administration of medications. (§ 12300, subd. (c).)

Supportive services also includes those "necessary paramedical services that are ordered by a licensed health care professional who is lawfully authorized to do so, which persons could provide for themselves but for their functional limitations. Paramedical services include the administration of medications, puncturing the skin or inserting a medical device into a body

12

homes or abodes of their own choosing unless these services are provided. (§ 12300, subd. (a); see *Guerrero v. Superior Court* (2013) 213 Cal.App.4th 912, 921-924 (*Guerrero*) [detailing the statutory history of the IHSS program].) "The program compensates persons who provide the services to a qualifying incapacitated person." (*Basden v. Wagner* (2010) 181 Cal.App.4th 929, 931 (*Basden*).)

Each county is required to act as, or establish, an employer for IHSS providers for purposes of collective bargaining and other applicable state or federal laws. (§ 12302.25, subd. (a).)[8] A county may hire homemakers and other IHSS personnel, or may contract with a city, county, or city or county agency, a local health district, a voluntary nonprofit agency, a proprietary agency, or an individual, or make direct payment to a recipient for the purchase of services. (§ 12302.) At its option, a county board of supervisors may elect either to contract with a nonprofit consortium, or establish, by ordinance, a public authority, to provide for the delivery of in-home supportive services. (§ 12301.6, subd. (b).)

In 2001, San Diego County created a Public Authority to provide for the delivery of in-home supportive services. (San Diego County Ord. No. 9345 added art. IIIb to the San Diego County Admin. Code, eff. July 19, 2001.) The IHSS Public Authority is a corporate public body

---

orifice, activities requiring sterile procedures, or other activities requiring judgment based on training given by a licensed health care professional." (§ 12300.1.)

[8] In 2012, the Legislature amended section 12302.25, subdivision (a). Section 12302.25 now provides that the county shall act as, or establish, an employer for in-home supportive services for purposes of collective bargaining and other applicable state and federal laws, *except as provided in section 110000 et seq. Title 23 of the Government Code*. (Stats. 2012, ch. 439, § 34, eff. Sept. 22, 2012.) Our discussion in this opinion is limited to the claims raised under the previous version of this statute, which was in effect at the time of the proceedings at issue here.

that exercises public and essential governmental functions and has all necessary powers and authority to carry out the delivery of in-home supportive services. (§ 12301.6, subd. (b)(2)(B).)

The Legislature requires that any IHSS public authority provide all of the following functions: assist recipients in finding IHSS personnel through the establishment of a registry; investigate the qualifications and background of potential personnel; and establish a referral system under which IHSS personnel shall be referred to recipients. In addition, public authorities are to provide for training for providers and recipients; perform any other functions related to the delivery of in-home supportive services; and ensure compliance with the personal care option under applicable federal law. (§ 12301.6, subd. (e).)

Any public authority is deemed to be the employer of personnel who are referred to recipients of IHSS, for the purposes of collective bargaining over wages, hours, and other terms and conditions of employment. Recipients retain the right to hire, fire and supervise the work of any IHSS personnel who provide services to them. (§ 12301.6, subd. (c)(1).) In selecting providers to perform services, preference shall be given to any qualified provider who is chosen by any recipient of personal care services. (§ 12304.1.) Recipients of IHSS may elect to receive services from providers who are not referred to them by the public authority. Those providers shall be referred to the public authority for the purposes of wages, benefits, and other terms and conditions of employment. (§ 12301.6, subd. (h).)

B.      Overview of applicable wage orders

"California's labor statutes reflect a strong public policy in favor of full payment of wages for all hours worked." (*Armenta v. Osmose, Inc.* (2005) 135 Cal.App.4th 314, 324.) California law governing wages, hours, and working conditions is embodied, to a large extent, in Labor Code section 1171 et seq. and the regulations (wage orders) promulgated by the IWC. (*Gould v.*

14

*Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1148.)  A claim under Labor Code 1194 is a claim under the applicable wage order and is subject to the wage order's definitional provisions.  (*Martinez v. Combs* (2010) 49 Cal.4th 35, 63 (*Martinez*).)

IWC has a " 'broad statutory mandate' to regulate the working conditions of employees in California, including setting standards for minimum wages and maximum hours.  [Citation.]" (*Sheppard v. North Orange County Regional Occupational Program* (2010) 191 Cal.App.4th 289, 304-305.)  The IWC has promulgated numerous wage orders, including a minimum wage order and other orders that are specific to various occupations.  (See Cal. Code Regs., tit. 8, §§ 11000-11170.)  "Courts must give the IWC's wage orders independent effect in order to protect the commission's delegated authority to enforce the state's wage laws and, as appropriate, to provide greater protection to workers than federal law affords.  [Citations.]"  (*Martinez, supra,* 49 Cal.4th at pp. 68, 67.)[9]  IWC wage orders are to be accorded the same dignity as statutes and are " 'presumptively valid' " legislative regulations of the employment relationship.  (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1027, citing *Martinez,* at p. 65.)

IWC has adopted minimum wage orders pursuant to statute.  (See Labor Code, § 1182.11.) Wage order No. 4 generally applies to "all persons employed in professional, technical, clerical, mechanical, and similar occupations whether paid on a time, piece rate, commission, or other basis . . . ."  (Cal. Code Regs., tit. 8, § 11040, subd. (1).)  It sets a minimum wage and further provides that "[e]very employer shall pay to each employee, on the established payday for the period involved, not less than the applicable minimum wage *for all hours worked* in the payroll

---

9    Federal wage law is codified in the Fair Labor Standards Act (FLSA).  (29 U.S.C. §§ 201-219; see also 29 C.F.R. § 541.0 et seq.)

15

period, whether the remuneration is measured by time, piece, commission, or otherwise." (*Id.*, § 11140, subd. (4)(B), italics added.)

Wage order No. 15 applies to persons employed in "household occupations," including IHSS providers. (Cal. Code Regs., tit. 8, § 11150; *Guerrero, supra,* 213 Cal.App.4th at p. 946.)[10] " 'Household Occupations' " means "all services related to the care of persons or maintenance of a private household or its premises by an employee of a private householder," including, but not limited to, cooks, day workers, graduate nurses, grooms, house cleaners, housekeepers, maids, and practical nurses. (Cal. Code Regs., tit. 8, § 11150, subd. (2)(I).) Wage order No. 15 defines " '[h]ours worked' " as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." (*Id.*, subd. (2)(H).)

---

[10] We reject Public Authority's argument that wage order No. 2 (Cal. Code Regs., tit. 8, § 11020), which exempts public employees from overtime wage requirements, controls here. Wage order No. 2 applies to all persons employed in the personal services industry, which means any business operated for the purpose of providing any service "used or useful in the care, cleansing, or beautification of the body, skin, nails, or hair, or in the enhancement of personal appearance or health, including but not limited to beauty salons, . . . barber shops, bath and massage parlors, physical conditioning, weight control salons, health clubs, and mortuaries." (Cal. Code Regs., tit. 8, § 11020, subd. (2)(J).)

By contrast, IHSS providers generally provide " 'services related to the care of persons or maintenance of a private household or its premises [as] an employee of a private householder' " as described in wage order No. 15. (*Guerrero*, *supra*, 213 Cal.App.4th at p. 955.)

THE EMPLOYMENT RELATIONSHIP BETWEEN PUBLIC AUTHORITY AND IHSS PROVIDERS

A.     Public Authority may raise on appeal the issue of whether it is Appellants' employer for purposes of compliance with wage and hour laws

Citing the IHSS statutory scheme, the trial court ruled that Public Authority is the employer of IHSS providers.[11]  Without having filed a cross-appeal challenging the trial court's finding that Public Authority *is* Appellants' employer, Public Authority asserts that Appellants cannot show reversible error on any claim unless Public Authority is, legally and factually, their employer for wage and hour purposes.  Public Authority offers extensive argument in its briefing as to why it *is not* Appellants' employer and asks this court to affirm the judgment in its favor, and each of the trial court's challenged rulings, on this ground alone.

Generally, respondents who fail to file a cross-appeal cannot claim error in connection with the opposing party's appeal.  (*Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439; *California State Employees' Assn. v. State Personnel Bd.* (1986) 178 Cal.App.3d 372, 382, fn. 7 [as a general rule, a respondent who has not appealed from the judgment may not urge error on appeal].)  However, section 906 of the Code of Civil Procedure provides a limited exception to this rule:  The respondent may, without appealing from the judgment, ask the reviewing court to review any of the trial court's orders or rulings for the purpose of determining whether the appellant was prejudiced by the error or errors upon which he or she relies for reversal or modification of the

---

11     The trial court did not expressly state that it found that Public Authority was Appellants' employer *for purposes of compliance with wage and hour laws*.  However, we infer that this is the court's finding since Public Authority does not dispute that it is the employer of IHSS personnel for purposes of negotiating wages, benefits, and terms and conditions of employment.  The court subsequently ruled that as a public employer, Public Authority is exempt from wage and hour laws.  See Discussion, part V.B., *post*.

judgment from which the appeal is taken. (*Hutchinson v. City of Sacramento* (1993) 17 Cal.App.4th 791, 798.) " 'The purpose of the statutory exception is to allow a respondent to assert a legal theory which may result in affirmation of the judgment.' [Citation.]" (*Ibid.*; *Fuller v. Bowen* (2012) 203 Cal.App.4th 1476, 1484.) Because Public Authority's argument is that Appellants were not prejudiced by any of the trial court's orders or rulings since Public Authority is not their employer for purposes of compliance with wage and hour laws, we address this contention.

Public Authority argues that every IHSS provider has more than one employer, each of which acts as an employer only for certain specified purposes. Public Authority asserts that it does not exercise control over the wages, hours, or working conditions of any provider and instead, acts merely as "a payroll processor." Public Authority maintains that the State of California is the employer of IHSS personnel for purposes of workers compensation, unemployment, federal and state income tax withholding, and old-age survivor and disability benefits (§§ 12302.2, 12302.21), and that the IHSS recipient is the provider's employer for purposes of other applicable state or federal laws, including wage laws. In the alternative, Public Authority contends that if this court determines that it *is* Appellants' employer, it is constitutionally immune from statutory and regulatory wage and hour laws because it is a public entity.

B.     The trial court did not err when it determined that Public Authority is Appellants' employer under the IHSS statutory scheme

Public Authority acknowledges that it is the employer of IHSS personnel for purposes of collective bargaining, i.e., for negotiating wages, benefits, and terms and conditions of employment. However, citing section 12301.6, subdivision (c)(1), which provides that the

18

recipient of in-home supportive services retains "the right to hire, fire, and supervise the work of any IHSS personnel providing services to them," Public Authority maintains that it is not the employer for purposes of compliance with wage and hour laws. We reject this contention.

The Legislature enacted the IHSS program in 1973 to provide supportive services to qualified aged, blind or disabled persons to allow them to remain in their homes and avoid institutionalization. (*Guerrero*, *supra*, 213 Cal.App.4th at p. 920; *Basden*, *supra*, 181 Cal.App.4th at p. 931.) The California Department of Social Services (DSS) " 'promulgates regulations that implement the program, and county welfare departments administer the program' " under the supervision of DSS. (*Guerrero*, at p. 921, quoting *Basden*, at pp. 933-934.) "[I]n administering the IHSS program, counties act as agents of the state, rendering both the state and County employers of the IHSS provider." (*Guerrero*, at pp. 933-934, citing *In-Home Supportive Services v. Workers' Comp. Appeals Bd.* (1984) 152 Cal.App.3d 720, 731 (*In-Home Supportive Services*).)

Section 12302.25, subdivision (a) requires a county to "act as, or establish, *an employer* for [IHSS] providers" for the purposes of collective bargaining "*and other applicable state or federal laws.*"[12] Similarly, section 12301.6, subdivision (c)(1) states that "[a]ny [public authority

---

[12] Public Authority also argues that the In-Home Supportive Services Employer-Employee Relations Act, Government Code section 110000 et seq., enacted in 2012, clarifies that the Public Authority is the employer of IHSS providers for the purpose of collective bargaining and that the recipient is "the employer of an individual in-home supportive services provider with the unconditional and exclusive right to hire, fire, and supervise his or her provider." (Gov. Code, § 110003, subd. (d).) Government Code section 110023, subdivision (a) provides that the scope of representation for collective bargaining includes "all matters relating to wages, benefits, and other terms and conditions of employment" but excludes functions performed by, or on behalf of, a county, including determining an applicant's eligibility for in-home supportive services; assessing, approving, and authorizing a recipient's initial and continuing need for services; qualifying providers; and assisting recipients in finding eligible providers by establishing a

19

created] pursuant to this section shall be deemed to be *the employer* of [IHSS] personnel referred to recipients pursuant to [§ 12301.6, subd. (e)(3)] for the purposes of collective bargaining over wages, hours, and other terms and conditions of employment." Public Authority is thus necessarily an agent of the county in administering the IHSS program. (*Guerrero*, *supra,* 213 Cal.App.4th at p. 934.)

In examining the limitations, if any, on Public Authority 'in its role as an employer of IHSS providers, we must ascertain the intent of the Legislature to "adopt the construction that best effectuates the purpose of the law." (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715.) We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent, giving the words of the statute their ordinary and usual meaning. If the statutory language is unambiguous, " 'we presume the Legislature meant what it said, and the plain meaning of the statute governs.' " (*Whaley v. Sony Computer Entertainment America, Inc.* (2004) 121 Cal.App.4th 479, 485, 484, quoting *People v. Robles* (2000) 23 Cal.4th 1106, 1111.)

The Legislature clearly states in sections 12302.25, subdivision (a) and 12301.6, subdivision (c)(1) that any IHSS public authority is an employer of IHSS personnel, not only for purposes of collective bargaining for wages, hours, and other terms and conditions of

provider registry and providing an orientation to recipients. The Legislature modified Welfare and Institutions Code section 12302.25, subdivision (a) to read: ". . . each county shall act as, or establish, an employer for [IHSS] providers . . . for purposes of [collective bargaining] and other applicable state or federal laws, *except as provided in [the In-Home Supportive Services Employer-Employee Relations Act].*" (Italics added.)

"It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' [Citation.]" (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) The issue before the court at the time of the judgment was whether the plaintiffs were entitled to wages under the then-existing statutory and regulatory framework. We therefore need not consider the impact of the IHSS Employer-Employee Relations Act here.

employment, but also for compliance with *other applicable state or federal laws*. The Legislature did not exclude a public authority from the definition of " 'employer' " for purposes of compliance with wage and hour laws, as it did for purposes of liability due to the negligence or intentional torts of IHSS personnel under section 12301.6, subdivision (f)(1). (*Guerrero*, *supra,* 213 Cal.App.4th at p. 949.) Where the Legislature uses a particular word or phrase in one statute, the omission of that word or phrase in another statute dealing with the same general subject matter shows a different legislative intent. (*In re Jennings* (2004) 34 Cal.4th 254, 273.) If the Legislature had intended to relieve an IHSS public authority from the duty to comply with "other applicable state or federal laws," including state statutory and regulatory wage and hour laws, we presume that it would have so stated. (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 219 (*Tiernan*) [if the Legislature had intended a particular effect, it would have clearly said so].)

We are not persuaded by Public Authority's argument that because recipients "retain the right to hire, fire, and supervise the work of any [IHSS] personnel providing services to them" (§ 12301.6, subd. (c)(1)) and "retain the right to chose the individuals that provide their care and . . . to hire, fire, train, and supervise any provider under [the public authority mode of service]" (§ 12302.25, subd. (a)), the Legislature intended to exempt public authorities from complying with wage and hour laws. The fact that "an IHSS worker is an employee of the IHSS recipient is not a barrier to the conclusion the state is *also* the worker's employer." (*In-Home Supportive Services, supra,* 152 Cal.App.3d at p. 732.) "Joint employment occurs when two or more persons engage the services of an employee in an enterprise in which the employee is subject to the control of both." (*Ibid.*)

21

Our interpretation is supported by section 12301.6, subdivision (h), which provides that recipients may elect to receive services from providers who are not referred to them by the public authority, but that those providers must be referred to the public authority for "*the purposes of wages, benefits, and other terms and conditions of employment*."  (Italics added.)  Thus, the statutory framework supports the conclusion that Public Authority *is* an employer of IHSS providers for the purpose of compliance with wage and hour laws.

Our conclusion is in accord with *Guerrero*, in which the reviewing court concluded that the county and its IHSS public authority were " 'employer[s]' " of the IHSS providers within the common law meaning of the term " ' "employ." ' "  (*Guerrero*, *supra,* 213 Cal.App.4th at pp. 946-947, 948-952.)  The *Guerrero* court reasoned that the term "employ" means, "(a) to exercise control over the wages, hours, or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship."  (*Martinez*, *supra*, 49 Cal.4th at p. 64.)  The *Guerrero* court noted that the county or public authority, or both, determines the recipient's eligibility and need for services under the IHSS program,[13] and authorizes the recipient to hire a household worker, and also identifies the specific tasks that the provider will perform and for which the IHSS program will pay.  The county is responsible for determining whether a recipient is eligible for services; determining the level and quality of services the recipient requires; and terminating a recipient's participation in IHSS.  (*Guerrero*, at p. 936.)  The public authority is the employer for purposes of collective bargaining and as such, determines the provider's rate of pay for IHSS.  (§ 12302.25, subd. (a).)  The public authority is responsible for

[13]	"In any in-home supportive services action concerning the amount of in-home supportive services to be provided, the department shall send a notice of the action to each recipient.  The recipient shall also receive a description of each specific task authorized and the number of hours allotted."  (§ 12300.2.)

22

documenting the hours worked and entering the provider's time sheet into a database maintained by the state, changing the information as necessary to ensure correct payment.  In addition to its responsibilities for collective bargaining and ensuring correct payment to providers, the public authority exercises effective control over a provider's wages, hours and working conditions by: "establishing a registry to provide assistance to recipients in finding providers; investigating the qualifications and background of potential providers; establishing a referral system under which providers are referred to recipients; providing for training for providers and recipients; and performing any other functions related to the delivery of in-home supportive services." (*Guerrero*, at pp. 949-950, citing § 12301.6, subds. (a)-(c).)

The trial court did not err when it determined that Public Authority is the employer of IHSS personnel under the IHSS statutory scheme for purposes of compliance with wage and hour laws.

V

PRETRIAL MOTIONS

A.     The trial court erred in denying leave to amend the complaint to add a claim for reimbursement for transportation costs incurred on behalf of a recipient

1.     *Factual and procedural background*

Appellants sought leave to amend the complaint to add a claim under Labor Code section 2802.  The proposed claim read:

> "26. Although the Providers are regularly required to incur transportation costs to execute their duties of employment, the Providers are not reimbursed for these costs.  Examples of such transportation costs include automobile and fuel usage (and/or taxi fares) in the course of shopping for Recipients, running other errands for Recipients, and taking Recipients to medical appointments."

23

Labor Code section 2802, subdivision (a) directs an employer to indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties. Subdivision (c) of Labor Code section 2802 defines " ' "necessary expenditures" ' " as including " 'all reasonable costs.' " (*Gattuso v. Harte-Hanks Shoppers, Inc*. (2007) 42 Cal.4th 554, 561.) The statute was " 'designed to prevent employers from passing their operating expenses on to their employees. For example, if an employer requires an employee to travel on company business, the employer must reimburse the employee for the cost of that travel under [Labor Code] Section 2802.' " (*Id*. at p. 562, quoting Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 1305 (1999-2000 Reg. Sess.) as amended Aug. 18, 2000, p. 3.)

Relying on *Johnson v. Arvin-Edison Water Storage Dist.* (2009) 174 Cal.App.4th 729, 733 (*Johnson*), a case that involved the sovereign powers of a water storage district, the trial court found that Labor Code section 2802 did not expressly apply to public employees, and on that basis denied the motion for leave to amend.

2.    *The parties' contentions*

Appellants contend that the trial court abused its discretion in denying leave to amend their petition to add a claim for reimbursement of transportation costs under Labor Code section 2802. They maintain that section 2802 applies, by its plain terms, to all employers, including public entity employees. Appellants contend that *Johnson* did not address the applicability of Labor Code section 2802 to public entity employees and does not constitute sound authority to support the denial of leave to amend a claim for transportation expenses incurred on behalf of an IHSS recipient in the performance of authorized services.

24

Relying on *Johnson*, Public Authority argues that Labor Code section 2802 has not been made specifically applicable to public employees and that it therefore applies only to employees in the private sector.  (*Johnson*, *supra*, 174 Cal.App.4th at p. 736.)  In the alternative, Public Authority argues that even if Labor Code section 2802 applies to IHSS public authorities, Appellants are not entitled to compensation for the expenses at issue because the more specific IHSS statutes do not provide for reimbursement of work-related expenses.

3.      *Standard of review*

Code of Civil Procedure section 473, subdivision (a)(1) states:  "The court may, in furtherance of justice, and on any terms as may be proper, allow a party to amend any pleading or proceeding by adding or striking out the name of any party, or by correcting a mistake in the name of a party, or a mistake in any other respect; and may, upon like terms, enlarge the time for answer or demurrer.  The court may likewise, in its discretion, after notice to the adverse party, allow, upon any terms as may be just, an amendment to any pleading or proceeding in other particulars; and may upon like terms allow an answer to be made after the time limited by this code."  "[L]eave to amend a pleading should be liberally granted as long as there is no timeliness problem under a statute of limitations or prejudice to the opposing party.  (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 240.)

" 'Leave to amend a complaint is thus entrusted to the sound discretion of the trial court. ". . . The exercise of that discretion will not be disturbed on appeal absent a clear showing of abuse.  *More importantly, the discretion to be exercised is that of the trial court, not that of the reviewing court.*  Thus, even if the reviewing court might have ruled otherwise in the first instance, the trial court's order will yet not be reversed unless, as a matter of law, it is not

25

supported by the record." ' [Citations.]" (*Branick v. Downey Savings and Loan Assn.* (2006) 39 Cal.4th 235, 242.)

4.    *Analysis*

As we have discussed, when we are presented with a question of statutory construction, we begin by looking at the statutory language to determine legislative intent, giving the words of the statute their ordinary and usual meaning. (*People v. Robles, supra,* 23 Cal.4th at p. 1111.) "The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387, 1386.)

Section 12300, subdivision (e)(3) explicitly authorizes a provider to accompany the recipient "when needed during necessary travel to health-related appointments or alternative resource sites." A recipient may also require a provider to perform errands related to medical services, such as picking up prescriptions, and domestic services, such as grocery shopping. (§§ 12300, subd. (b), 14132.95, subd. (d).) As previously discussed, the County of San Diego established Public Authority as an employer for IHSS providers for the purposes of collective bargaining "*and other applicable state or federal laws.*"[14] (§ 12302.25, subd. (a), italics added; see also § 12301.6, subd. (h) [a provider who is not referred to the recipient by the public authority must be referred to the public authority for "*the purposes of wages, benefits, and other terms and conditions of employment*"], italics added.) Statutes governing conditions of

_____

[14]    The record is silent as to any collective bargaining agreement that may control the reimbursement of noncommute transportation costs that a provider may incur on behalf of a recipient.

26

employment are broadly construed in favor of protecting employees. (*Bearden v. U.S. Borax, Inc*. (2006) 138 Cal.App.4th 429, 435 (*Bearden*).) The statutes that authorize a provider to transport a recipient to medical appointments, when needed, and to perform errands related to other authorized services, the statutory language referring to other applicable state or federal laws, and the absence of any language explicitly exempting IHSS providers from the requirements of Labor Code section 2802, indicates that the Legislature did not intend that providers bear the costs of necessary expenditures incurred in direct consequence of the discharge of his or her duties. (Labor Code, § 2802; see *Tiernan*, *supra*, 33 Cal.3d at p. 219 [if the Legislature intended that effect, it would have clearly said so].)

The trial court's reliance on *Johnson* is misplaced. *Johnson* concerned the application of Labor Code sections 510 and 512 to a water district, which is a municipal corporation with sovereign powers of its own, including the power to set employee compensation pursuant to Water Code sections 40356 and 43152, subdivision (c). (*Johnson*, *supra*, 174 Cal.App.4th at pp. 734-735, 738.) *Johnson* did not concern the applicability of Labor Code section 2802 to an IHSS provider, who is an employee of both a public authority and a private party. "It is axiomatic that cases are not authority for propositions not considered." (*People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10.) Accordingly, we conclude that the court erred when it denied Appellants leave to amend the complaint to add a claim for reimbursement of employee expenses under Labor Code section 2802.

B.     The trial court erred in sustaining Public Authority's demurrer to claims for statutory and regulatory overtime

1.     *Factual and procedural background*

The complaint alleged that Appellants often worked in excess of eight hours in a workday and/or more than 40 hours in a workweek, and that Public Authority, in violation of Labor Code section 510 and wage order No. 17,[15] did not pay overtime compensation to the providers.  The trial court ruled that Labor Code sections 510 and 1194, and wage order No. 17 do not apply to public employees, and sustained the demurrer without leave to amend.

2.     *The parties' contentions*

Appellants contend that the trial court erred in sustaining Public Authority's demurrer to their claim for overtime compensation.[16]  They argue that Labor Code section 510 applies to "[a]ny work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek" regardless whether the work is performed by an employee of a public entity or an employee of a private entity.  They further seek reversal of the order sustaining the demurrer without leave to amend, pursuant to wage order No. 15 and section 207(a) of the FLSA, title 29 United States Code sections 201-219.

---

[15]     During the trial court proceedings, Appellants relied on wage order No. 17 and did not assert that wage order No. 15 applied to IHSS providers.  During the pendency of this appeal, the *Guerrero* court concluded that wage order No. 15 applies to persons employed in household occupations, including IHSS providers.  (*Guerrero*, *supra*, 213 Cal.App.4th at pp. 952-955.)

[16]     In the alternative, Appellants contend that the trial court erred in failing to grant leave to amend the complaint with a claim for overtime compensation.  The language in the proposed FAC is identical to the language in the (initial) complaint except that the word "provider" was substituted for the word "employee."  The substitution of the word "provider" for "employee" is not material.

Again relying on *Johnson*, Public Authority argues that Labor Code section 510 does not apply to public entities. (*Johnson, supra,* 174 Cal.App.4th at pp. 736-739.) Public Authority also argues that IHSS providers are exempt from overtime provisions under wage order No. 2,[17] which specifically exempts public employees in the personal services industry from overtime requirements, and further argues that the overtime provisions of the FLSA do not apply. Public Authority fails to address either the applicability of wage order No. 15 or the DSS's regulations that govern overtime compensation for IHSS providers. Those regulations provide that "[n]on live-in employees shall be compensated at the base rate for the first [40] hours worked during a work week. Each hour, or fraction thereof, worked in excess of [40] hours during a work week shall be compensated at one and one-half times the base rate." (DSS Manual, Reg. No. 30-764.32, Manual Letter No. SS-98-01, p. 92, eff. Nov. 14, 1998 (DSS IHSS Overtime Reg.).) Public Authority further contends that it does not have any control over a recipient's supervision of a provider, or over state funding for the IHSS program, and therefore cannot be held responsible as an employer for payment of overtime wages.

3.      *Standard of review*

We review de novo orders sustaining demurrers. (*Sheppard v. North Orange County Regional Occupational Program, supra,* 191 Cal.App.4th at pp. 296-297.) When a demurrer has been sustained without leave to amend, we assume the truth of all properly pleaded facts and accept as true all facts that may be implied or inferred from those facts. (*Evans v. City of*

---

17      The record shows that Appellants filed an erratum to their opening brief on March 4, 2013, seeking reversal of the demurrer pursuant to wage order No. 15 as well as Labor Code section 510. Appellants deleted the language from their opening brief that relied on wage order No. 2. The erratum was timely served on attorneys for Respondent. As previously discussed in footnote 10, *ante*, we reject Public Authority's contention that wage order No. 2 applies to providers of IHSS.

*Berkeley* (2006) 38 Cal.4th 1, 6; *Curcini v. County of Alameda* (2008) 164 Cal.App.4th 629, 633, fn. 3.)  If the trial court sustains a demurrer without leave to amend, we determine whether plaintiffs could amend the complaint to state a cause of action.  (*Curcini,* at p. 637.)

The plaintiffs have the burden to show that the trial court abused its discretion in denying leave to amend.  (*Guerrero*, *supra*, 213 Cal.App.4th at pp. 925-926.)  If the trial court's ruling is correct on any theory, even one not mentioned by the court, the ruling will be affirmed.  (*Id*. at p. 926.)  However, the trial court's order sustaining the demurrer will be reversed if the complaint states a cause of action on any possible legal theory.  (*Aubry v. Tri-City Hospital Dist*. (1992) 2 Cal.4th 962, 967.)

Again, statutes governing conditions of employment are broadly construed in favor of protecting employees.  (*Bearden*, *supra*, 138 Cal.App.4th at p. 435.)  Wage orders, as quasi-legislative regulations, are construed in accordance with standard rules of statutory interpretation.  (*Ibid*.)  "To the extent a wage order and a statute overlap, we will seek to harmonize them, as we would with any two statutes.  [Citation.]"  (*Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at p. 1027.)

4.      *Public Authority's policy concerns*

We first address Public Authority's argument that because it cannot control the hiring, firing or supervision of providers, and the IHSS funding scheme does not provide resources to pay overtime wages, Public Authority should not be liable for wages that it has no authority to control.  Like the *Guerrero* court, we disagree with the premise that Public Authority, as an agent of the county, lacks any control over the provision of services by providers to recipients.  (*Guerrero*, *supra*, 213 Cal.App.4th at pp. 943-944.)

30

"The IHSS program pays for specified services delivered to qualified recipients up to a maximum number of hours. Where a qualified provider delivers services *other* than those authorized and covered by the program or for a greater number of hours than authorized *and* real parties in interest have *no knowledge* that such is occurring and are realistically unable to inform themselves of such, we agree it would be inappropriate to impute the recipient's knowledge to real parties in interest so as to require real parties in interest to pay for such services." (*Guerrero*, *supra*, 213 Cal.App.4th at p. 944, citing *McCune v. Oregon Sr. Services Div*. (9th Cir. 1990) 894 F.2d 1107, 1111-1112 (*McCune*).)

The *McCune* court recognized that IHSS recipients receive state and federal aid and that it would not be appropriate to allow them to control the hours worked and then force the state to pay for the services performed. (*McCune*, *supra*, 894 F.2d at pp. 1111-1112.) " 'The total amount of services provided to any one person is limited by statute. Severely impaired recipients may receive up to 283 hours per month, or approximately 65.4 hours per week, of supportive services paid through the program. Less severely impaired recipients may receive up to 195 hours per month, or approximately 45 hours per week. (§ 12303.4.)' " (*Guerrero*, *supra*, 213 Cal.App.4th at p. 921, quoting *Basden*, *supra*, 181 Cal.App.4th at pp. 934, 933.) However, if Public Authority merely informs the recipient and provider of the number of authorized hours *per month* and provides no other explicit instructions for how those hours may be used, then it would be appropriate to impute knowledge of any overtime hours worked, within the total number of authorized hours, to Public Authority.[18]

---

[18]  For example, if a severely impaired recipient is authorized to receive a total of 60 hours of services per week from two providers, and one of the providers is unable to work during a given week and no other provider is available to assist the recipient, the recipient may require the other

31

5. *Statutory overtime*

Generally, California workers are statutorily entitled to overtime compensation for working in excess of a 40-hour work week or in excess of an eight-hour workday, unless they are properly classified as falling within one of the narrow exemption categories. (*United Parcel Service Wage & Hour Cases* (2010) 190 Cal.App.4th 1001, 1009-1010.) Labor Code "[s]ection 510 provides that eight hours of labor constitutes a day's work. It then sets forth the various minimum overtime rates for work in excess of eight hours in one workday, 40 hours in one workweek, and 12 hours in one workday, and hours worked on the seventh day of work in a workweek." (*Johnson*, *supra*, 174 Cal.App.4th at p. 735.)

In *Johnson*, the reviewing court stated that the indicia of legislative intent led it to conclude that a water storage district, as a public entity, was exempt from Labor Code section 510 and that, in any event, the district was exempt under the " ' "sovereign powers" ' " canon of statutory interpretation.[19] (*Johnson*, *supra*, 174 Cal.App.4th at p. 738.)

_____

provider to work 60 hours that week to avoid placement in institutional care at greater cost to the state. Similarly, if a provider is authorized to work 160 hours a month for one recipient, the provider may work 50 hours one week and 30 hours another week for that recipient, depending on the recipient's needs and the availability of other persons to assist in the recipient's care. In both of these scenarios, the provider would be eligible for overtime wages.

[19]     Under the " 'sovereign powers' " canon, government agencies are excluded from a statute only if their inclusion would result in an infringement upon their sovereign governmental powers. (*Johnson*, *supra*, 174 Cal.App.4th at p. 738.) "A statute infringes upon a public entity's sovereign powers if the statute affects the entity's governmental purposes and functions." (*Ibid*.) The *Johnson* court concluded that Labor Code section 510 would infringe upon the water district's explicit sovereign authority to set employee compensation. (*Johnson,* at p. 739.)
    Unlike the water storage district in *Johnson*, a public authority does not have the sovereign power to set employee compensation, but instead, must engage in collective bargaining to set wages, benefits and conditions of employment. (§ 12301.6, subd. (c)(1).) Applying this canon of construction, Labor Code section 510, as a generally applicable statute, would apply to a public

32

By contrast, under the public authority model, the IHSS program involves joint employment of a provider by a public entity and a private person. (*In-Home Supportive Services v. Workers' Comp. Appeals Bd.*, *supra*, 152 Cal.App.3d at p. 732; see *Bonnette v. California Health and Welfare Agency* (1983) 704 F.2d 1465, 1470 [public entities and recipients were joint employers of IHSS providers for purposes of the FLSA], abrogated on other grounds by *Garcia v. San Antonio Metropolitan Transit Authority* (1985) 469 U.S. 528, 538-539.) Section 12302.25, subdivision (a) requires a county to "act as, or establish, an employer for [IHSS] providers" for the purposes of collective bargaining "and other applicable state or federal laws." This employer may be a public or private entity.[20] We do not believe that the Legislature intended that one set of wage and benefit laws would apply when an IHSS provider was employed by a nonpublic agency and that a different set of wage and benefit laws would apply when an IHSS provider was employed by a public agency.

As discussed earlier in this opinion, the Legislature did not exclude a public authority from the definition of the " 'employer' " for purposes of compliance with generally applicable wage and hour laws, as it did for purposes of liability due to the negligence or intentional torts of IHSS personnel. (*Guerrero*, *supra,* 213 Cal.App.4th at p. 949.) Where the Legislature uses a particular

---

authority, subject to "[a]n alternative workweek schedule adopted pursuant to a collective bargaining agreement . . . ." (*Id.*, subd. (a)(2).)

20      " 'A county may deliver services under the IHSS program by (1) hiring in-home supportive personnel in accordance with established county civil services requirements, (2) contracting with a city, county, city or county agency, a local health district, a voluntary nonprofit agency, a proprietary agency or an individual, or (3) making direct payment to a recipient for the purchase of services. (Welf. & Inst. Code, § 12302.)' [Citations.] A county board of supervisors may also elect to either '[c]ontract with a nonprofit consortium to provide for the delivery of in-home supportive services' (§ 12301.6, subd. (a)(1)) or '*[e]stablish, by ordinance, a public authority to provide for the delivery of in-home supportive services.*' (§ 12301.6, subd. (a)(2), italics added.)" (*Guerrero*, *supra*, 213 Cal.App.4th at pp. 922-923.)

word or phrase in one statute, the omission of that word or phrase in another statute dealing with the same general subject matter shows a different legislative intent. (*In re Jennings, supra,* 34 Cal.4th at p. 273.) Further, we broadly construe statutes governing conditions of employment in favor of protecting employees. (*Bearden*, *supra*, 138 Cal.App.4th at p. 435.) If the Legislature had intended to exempt an IHSS public authority from complying with overtime requirements under Labor Code section 510, we presume that it would have expressly stated so. (*Tiernan*, *supra*, 33 Cal.3d at p. 219.) We conclude that the trial court erred in sustaining the demurrer to Appellants' claim for statutory overtime on the ground that statutory and regulatory overtime laws do not apply to public employers.

6.      *Regulatory overtime*

Wage order No. 15 provides that nonlive-in employees shall not be employed more than eight hours in any workday or more than 40 hours in any workweek unless the employee receives one and a half times the employee's regular rate of pay for all hours worked above 40 hours in the workweek. Employment beyond eight hours in any workday or more than six days in any workweek is permissible provided that the employee is compensated for such overtime. (Cal. Code Regs., tit. 8, § 11150, subd. (3)(C); see *id.*, subd. (3)(C)(1-3) for schedule of overtime rates.) The *Guerrero* court concluded that public agencies, including IHSS providers, are not exempt from the provisions of wage order No. 15, which governs wages and hours of persons employed in "household occupations." (*Guerrero*, 213 Cal.App.4th at pp. 952, 953-955.) We agree.

In reaching this conclusion, the *Guerrero* court reasoned that unlike 14 of the 17 industry, occupation and miscellaneous wage orders, wage order No. 15 does not expressly exempt public

34

employees from its provisions.[21] (*Guerrero*, *supra*, 213 Cal.App.4th at p. 954.) "The express exemptions of the other 14 industrial and occupational wage orders state[s]: '[T]he provisions of this order shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city, county, or special district.' Wage order No. 15[] contains no language exempting public agencies or political subdivisions from its coverage." (*Guerrero*, at pp. 954, 955.) " 'Where a statute referring to one subject contains a critical word or phrase, omission of that word or phrase from a similar statute on the same subject generally shows a different legislative intent.' [Citation.]" (*In re Young* (2004) 32 Cal.4th 900, 907.) Thus "the plain language of [wage order No. 15], when compared with that of the other industrial and occupation wage orders, demonstrates the IWC did not intend to exempt public agencies or political subdivisions generally from its provisions applicable to household occupations." (*Guerrero*, at p. 955.) Further, under the public authority model, providers are not "directly employed by the State or any political subdivision." (*Id*. at p. 954.) Rather, they are hired and supervised by a private individual, who is subject to the provisions of wage order No. 15, within the limits determined by the county on the nature and amount of compensable hours for authorized services.

---

21    At oral argument, Public Authority argued that the IWC did not contemplate that wage order No. 15 would apply to public employees because, by its express terms, wage order No. 15 applies only to persons who are employed by private households. Public Authority maintains that this court should therefore look beyond the plain language of the wage order and exempt public employees from its provisions. However, the legislative scheme recognizes that a recipient is an employer of an IHSS provider who is providing services to that recipient. We presume that the Legislature was aware of the language in wage order No. 15 when it determined that recipients are employers of the IHSS providers who provide services to them. (*People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, 199 [reviewing court must assume that the Legislature was aware of existing, related laws when it enacted a statute and intended to maintain a consistent body of rules].)

Because the trial court's ruling is contrary to the provisions of wage order No. 15, we reverse the order sustaining the demurrer to Appellants' proposed claims for regulatory overtime without leave to amend. (*Branick v. Downey Savings and Loan Assn.*, *supra*, 39 Cal.4th at p. 242.)

7. *FLSA overtime*

The FLSA generally requires employers to pay covered employees one and one-half times their regular rate for all hours worked in excess of 40 hours per week. (29 U.S.C. § 207(a)(1).) This overtime requirement does not apply to those persons who are employed in domestic service to provide companionship services to individuals who are unable to care for themselves because of age or infirmity. (29 U.S.C. § 213(a)(15); *McCune*, *supra*, 894 F.2d at pp. 1107-1108.) However, this exemption does not apply when the performance of general household work (unrelated to the care of the aged or infirm person) exceeds 20 percent of the total weekly hours worked. (29 C.F.R. § 552.6; see also *Skipper v. Superior Diaries, Inc.* (5th Cir. 1975) 512 F.2d 409, 411 [under the FLSA, an employee's performance of both exempt and nonexempt activities during the same work week defeats any exemption that would otherwise apply].)

Public Authority argues that Appellants cannot present a viable cause of action for overtime compensation under the FLSA's domestic service overtime exemption because almost all of the services that are authorized under IHSS are necessarily related to the care of the recipient, and any services that do not relate to the individual recipient are limited and cannot approach the 20 percent threshold.

We cannot resolve the factual issue whether the general household services performed by Appellants exceeded 20 percent of the total weekly hours worked. That is a fact-intensive inquiry that the trial court may consider on a motion for summary judgment or at trial. (*Guerrero*, *supra*,

36

213 Cal.App.4th at pp. 940-943 [holding that the trial court erred in sustaining a demurrer on the IHSS plaintiff's claim for minimum wage and overtime protection under the FLSA because whether the 20 percent exception did or did not apply was a question of fact for the jury].) Appellants have shown that their complaint states a cause of action on a *possible* legal theory for overtime wages under the FLSA. The likelihood that they will be able to prove their allegation is not relevant in reviewing an order sustaining a demurrer. (*Tucker v. CBS Radio Stations, Inc.* (2011) 194 Cal.App.4th 1246, 1251.)

We conclude that the trial court erred when it granted Public Authority's demurrer without leave to amend on Appellants' claim for overtime compensation. Appellants have met their burden to show that their complaint states a cause of action on "any possible legal theory" for state and federal statutory and regulatory overtime wages. (*Aubry v. Tri-City Hospital Dist.*, *supra*, 2 Cal.4th at p. 967; *Guerrero*, *supra*, 213 Cal.App.4th at pp. 925-926, 940-943.)

C.      Appellants' motion for leave to amend the complaint to add claims for compensation and reimbursement for time spent completing a background check, attending an orientation, and completing the enrollment process

1.      *The parties' contentions*

Appellants contend that the trial court erred in denying their motion to amend the SAC to add a claim for minimum wage for time spent, and reimbursement for expenses incurred, in reviewing materials, attending an orientation after the Legislature enacted section 12301.24 in 2009 (2009 orientation), complying with a background check as required under section 12301.6, subdivision (e), and completing the process of enrolling on the Registry. Appellants contend that the time they spent complying with the requirements of the 2009 legislation constitutes " '[h]ours worked' " because during that time, they were subject to the control of their employer, as defined in work order No. 15. (See Cal. Code Regs., tit. 8, § 11150, subd. (2)(H).)

37

Public Authority argues that the minimum wage law does not entitle Appellants to compensation for time spent completing the 2009 orientation or background check because Appellants were complying with legislative requirements and were not subject to Public Authority's control during this time. In addition, Public Authority argues that the tasks for which Appellants sought compensation are not among the compensable services authorized under sections 12300, subdivisions (b) and (c), and 12300.1.

2. *Standard of review*

A court, in furtherance of justice, may allow a party to amend any pleading. (Code Civ. Proc., § 473, subd. (a)(1).) We review the trial court's ruling on a motion to amend a pleading for abuse of discretion. The appellant has the burden of establishing that the court abused its discretion. (*Emerald Bay Community Assn. v. Golden Eagle Ins. Corp.* (2005) 130 Cal.App.4th 1078, 1097.)

3. *Factual and procedural background*

In October 2009, the Legislature enacted section 12301.24,[22] which requires "all *prospective* providers" to complete a provider orientation at the time of enrollment and to comply

---

[22] "(a) Effective November 1, 2009, all prospective providers must complete a provider orientation at the time of enrollment, as developed by the department, in consultation with counties, which shall include, but is not limited to, all of the following: [¶] (1) The requirements to be an eligible IHSS provider. [¶] (2) A description of the IHSS program. [¶] (3) The rules, regulations, and provider-related processes and procedures, including time[]sheets. [¶] (4) The consequences of committing fraud in the IHSS program. [¶] (5) The Medi-Cal toll-free telephone fraud hotline and Internet Web site for reporting suspected fraud or abuse in the provision or receipt of supportive services.

"(b) In order to complete provider enrollment, at the conclusion of the provider orientation, all applicants shall sign a statement specifying that the provider agrees to all of the following: [¶] (1) He or she will provide to a recipient the authorized services. [¶] (2) He or she has received a demonstration of, and understands, time[]sheet requirements, including content, signature, and fingerprinting, when implemented. [¶] (3) He or she shall cooperate with state or county staff to

with a number of other requirements, and further requires that "*all current providers*" receive and review the same information that is required to be presented at the orientation, and submit a signed agreement to the appropriate county office. (Italics added.) In addition, the Legislature amended section 12301.6 to require IHSS public authorities to conduct criminal background checks of all current and prospective providers, at the provider's expense. (§ 12301.6, subd. (e), Stats. 2010, ch. 725, eff. Oct. 19, 2010.)

Appellants moved to amend the pleading to seek compensation and reimbursement for time spent and expenses incurred in complying with section 12301.24. They claimed that Public Authority required them to attend an orientation or, in the alternative, to review written materials, even though section 12301.24 applies only to prospective providers and Appellants were already providers at the time these statutes went into effect. The proposed amendment to the pleading states:

> "25. In addition to the foregoing, as a condition of continued employment, [Public Authority] has ordered current Providers to perform certain tasks and to pay certain expenses related to employment (in the absence of compensation or reimbursement), as follows:
> "a. to either review written materials, or to attend a training session;

---

provide any information necessary for assessment or evaluation of a case. [¶] (4) He or she understands and agrees to program expectations and is aware of the measures that the state or county may take to enforce program integrity. [¶] (5) He or she has attended the provider orientation and understands that failure to comply with program rules and requirements may result in the provider being terminated from providing services through the IHSS program.
"(c) Between November 1, 2009, and June 30, 2010, all current providers shall receive the information described in this section. Following receipt of this information, a provider shall submit a signed agreement, consistent with the requirements of this section, to the appropriate county office.
"(d) The county shall indefinitely retain this statement in the provider's file. Refusal of the provider to sign the statement described in subdivision (b) shall result in the provider being ineligible to receive payment for the provision of services and participate as a provider in the IHSS program." (§ 12301.24, added by Stats. 2009-2010, 4th Ex. Sess., ch. 17, § 3, eff. Oct. 23, 2009.)

"b. to travel to locations other than the Provider's normal workplace to be fingerprinted;

"c. to pay fees charged by private fingerprinting contractors;

"d. to pay additional fees charged by the California Department of Justice;

"e. to travel in person to an 'enrollment center' other than the Provider's normal workplace to present evidence that the Provider has performed the tasks outlined above, and to expend substantial time in an 'enrollment' process."

The trial court denied the motion to amend the complaint, finding that section 12301.6 directed that the investigation of the qualifications and background of potential personnel, including criminal background checks, be "conducted at the provider's expense." (§ 12301.6, subd. (e)(2)(A)(i).) The court found that subparagraphs (b) through (e) of paragraph 25 of the proposed amendment were part of the legislatively-mandated criminal background check. Relying on the California Department of Industrial Relations Division of Labor Standards Enforcement (DLSE) Opinion Letter, November 25, 2008, the court ruled that subparagraph (a) was required under section 12301.24, and that time spent in activities to comply with government requirements was not compensable, even if the requirements were necessary to maintain or secure employment.

4.      *The trial court did not err in denying leave to amend the complaint to add a claim for compensation and reimbursement for time spent and expenses incurred in completing a background check*

With respect to subparagraphs (b) through (d) of proposed paragraph 25, we conclude that there is no cause of action for minimum wage for time spent or reimbursement for expenses incurred in obtaining a background check because the Legislature expressly directed that "[c]riminal background checks shall be conducted at the provider's expense." (§ 12301.6, subd. (e)(2)(A)(i).) The trial court thus did not abuse its discretion in denying leave to amend the

40

pleadings to add a claim for wages and reimbursement for complying with the criminal background check requirement.

*5.      The trial court erred in denying leave to amend the complaint to add a claim for wages for attending the 2009 orientation and completing the enrollment process in person, but did not err in denying leave to amend to add claims for wages for time spent reviewing written materials*

In their briefing on appeal, Appellants claim that Public Authority required current providers to attend a 2009 orientation and complete the enrollment process in person, even though section 12301.24 imposes those requirements only on prospective providers.  Appellants claim that they are entitled to compensation for "hours worked" under applicable wage and hour laws for the time they spent complying with these requirements.  (See, e.g., Cal. Code Regs., tit. 8, § 11150, subd. (2)(H) [defining " '[h]ours worked' " as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so"].)

Public Authority argues that time spent attending a 2009 orientation and completing the enrollment process is not compensable as " 'hours worked' " because in completing these requirements, prospective providers were complying with government directives and were therefore not " 'subject to the control of the employer.' "  (See DLSE Opn. Letter, Nov. 25, 2008 [employee is not subject to the control of the employer, nor suffered or permitted to work for the employer, within the meaning of California's hours worked requirement when complying with a government mandated procedure.)[23]  Public Authority does not, however, respond to Appellants'

---

[23]     Although we generally give DLSE opinion letters " 'consideration and respect,' " they are not controlling and need not be followed if they do not contain persuasive logic or if they unreasonably interpret a wage order.  (*Cash v. Winn* (2012) 205 Cal.App.4th 1285, 1302, citing *Harris v. Superior Court* (2011) 53 Cal.4th 170, 190.)  Here, we agree with the DLSE's interpretation that government requirements on employees to undergo screenings and obtain

argument that *current providers* who were required to attend a 2009 orientation and complete the enrollment process in person could state a claim for compensation.

" '[T]he trial court has wide discretion in allowing the amendment of any pleading [citations], [and] as a matter of policy the ruling of the trial court in such matters will be upheld unless a manifest or gross abuse of discretion is shown. [Citations.]' " (*Record v. Reason* (1999) 73 Cal.App.4th 472, 486; Code Civ. Proc., § 473, subd. (a)(1).) However, courts must apply a policy of great liberality in permitting amendments to the complaint at any stage of the proceedings, up to and including trial, when no prejudice is shown to the adverse party. (*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 761; *Huff v. Wilkins* (2006) 138 Cal.App.4th 732, 746.)

We conclude that the trial court abused its discretion when it denied Appellants' request to amend their complaint to add a claim for compensation for time spent attending a 2009 orientation and completing the enrollment process in person. In denying the request to amend, the court misinterpreted section 12301.24 by applying the statutory requirements that govern prospective providers' enrollment in IHSS to current providers. (*People v. Superior Court (Humberto S.)* (2008) 43 Cal.4th 737, 742 [where the trial court's decision rests on an error of law, the trial court abuses its discretion].) The requirements that section 12301.24 imposes on "prospective providers" are clearly different from those that it imposes on "current providers." The Legislature has mandated that "all *prospective providers* must complete a provider orientation at the time of enrollment." (*Id.*, subd. (a), italics added.) In contrast, *current providers* are required to review written materials and "submit a signed agreement, consistent with the requirements of this section, to the appropriate county office." (*Id.*, subd. (c).) Unlike

clearances to ensure public safety do not fall within the meaning of "hours worked" under California law.

42

"all prospective providers," for whom attendance at "a provider orientation at the time of enrollment" is mandatory, the Legislature did not impose a requirement that *current providers* attend a 2009 orientation and/or complete the enrollment process in person. (Compare *id*., subd. (a) with subd. (c).)

Appellants may be entitled to compensation for "hours worked" if they can establish that Public Authority directed current providers to attend a 2009 orientation and/or travel to an enrollment center to submit their signed agreements.[24] (Code Civ. Proc., § 473, subd. (a)(1).) However, Appellants are not entitled to compensation for time spent reviewing written materials in compliance with a government directive. (DLSE Opn. Letter, Nov. 25, 2008.)

D. The trial court did not err when it granted Public Authority's motion for summary adjudication on the issue of whether Appellants are entitled to wages for time spent attending an orientation prior to the enactment of section 12301.24

1. *The parties' contentions*

Appellants contend that the court erred when it granted Public Authority's motion for summary adjudication on their claim that their attendance at a mandatory orientation constitutes "hours worked" and is compensable under applicable provisions of the Labor Code and IWC wage orders.

Public Authority responds that the trial court's summary adjudication ruling is proper because the orientation was for the benefit of the Appellants and other prospective IHSS providers, and was therefore exempt from minimum wage requirements under the rules

---

[24] If current providers have not completed a background check, they may be required to travel to an enrollment center in person to comply with criminal background check requirements. (See Discussion, pt. V.C.4., *ante*.)

43

promulgated by the DLSE to determine whether a trainee is an employee entitled to minimum wage for "hours worked" in a training program.  (See DLSE Opn. Letter, Apr. 7, 2010.)

2.    *Standard of review*

"A party is entitled to summary adjudication of a cause of action if there is no triable issue of material fact and the party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subds. (c) & (f)(1).) . . .  A defendant moving for summary adjudication of a cause of action must show that one or more elements cannot be established or that there is a complete defense.  (*Id.,* subd. (p)(2).)  A defendant can satisfy its burden by presenting evidence that negates an element of the cause of action or evidence showing that the plaintiff does not possess and cannot reasonably obtain needed evidence.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853-854.)  If the moving party satisfies its initial burden, the burden shifts to the opposing party to set forth 'specific facts' showing that a triable issue of material fact exists.  (Code Civ. Proc., § 437c, subd. (p)(1), (2).)  The court must view the evidence and reasonable inferences from the evidence in the light most favorable to the opposing party, as on a motion for summary judgment. (*Aguilar, supra,* at p. 843.)"  (*Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1154-1155.)

"The ruling on a motion for summary adjudication presents a question of law, so our review is de novo.  (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.)  We ordinarily affirm the ruling if it is correct on any ground, regardless of the trial court's stated reasons.  (*JEM Enterprises v. Washington Mutual Bank* (2002) 99 Cal.App.4th 638, 644.)  Before we can affirm the ruling on a ground not relied on by the trial court, however, we must afford the parties an opportunity to brief the issue on appeal, and the parties may request an opportunity to present additional evidence or conduct discovery on the issue.  (Code Civ.

Proc., § 437c, subd. (m)(2).)"  (*Syngenta Crop Protection, Inc. v. Helliker*, *supra*, 138 Cal.App.4th at pp. 1154-1155.)

3.      *Statement of law*

Minimum wage laws were not intended to penalize employers for providing, free of charge, the same kind of instruction at a place and in a manner which would most greatly benefit the trainees.  (*Walling v. Portland Terminal Co.* (1947) 330 U.S. 148, 153.)  "A person receiving training but *no salary*, and whose work serves only his or her own interest, is not an 'employee' for purposes of federal minimum wage and overtime laws . . . ."  (Rosen et al., Cal. Practice Guide:  Federal Employment Litigation (The Rutter Group 2008) ¶ 6:35, citing *Portland Terminal Co.*, at p. 153.)  On the other hand, where the company is the primary beneficiary of the trainee's labors, an employment relationship exists and minimum wage and overtime laws apply. (*McLaughlin v. Ensley* (4th Cir. 1989) 877 F.2d 1207, 1209, 1210 [mandatory, weeklong "orientation arrangement" that provided route salesmen with job familiarization was employment].)

The parties agree that in determining whether an intern/trainee is enrolled in a bona fide internship or training program that is outside the coverage of California's minimum wage laws, the criteria set forth in the April 7, 2010, DLSE Opinion Letter apply.[25]  Those criteria are:

> "(1) The training, even though it includes actual operation of the employer's facilities, is similar to that which would be given in a vocational school;
> "(2) The training is for the benefit of the trainees or students;
> "(3) The trainees or students do not displace regular employees, but work under their close observation;

---

[25]     These criteria were adopted from the federal Department of Labor, which derived them from the United States Supreme Court's decision in *Walling v. Portland Terminal Co.*, *supra*, 330 U.S. 148.

45

"(4) The employer derives no immediate advantage from the activities of trainees or students, and on occasion the employer's operations may be actually impeded;

"(5) The trainees or students are not necessarily entitled to a job at the conclusion of the training period; and

"(6) The employer and the trainees or students understand that the trainees or students are not entitled to wages for the time spent in training."

These criteria need not be strictly or rigidly applied. (*Harris v. Vector Marketing Corp.* (2010) 753 F.Supp.2d 996, 1006 [applying identical criteria under federal regulations].) Thus, in considering the DLSE factors, a totality of the circumstances controls whether a trainee should be deemed an employee for purposes of the application of California minimum wage laws. (DLSE Opn. Letter, Apr. 7, 2010, at p. 4, citing *Reich v. Parker Fire Protection District* (10th Cir. 1993) 992 F.2d 1023, 1027.) A flexible application allows a court to consider "all the economic realities of the relationship between the alleged employer and the trainees." (*Harris,* at p. 1006.)

4.      *Undisputed facts concerning the claim for compensation for attending a pre-2009 orientation*

Public Authority is required to establish a Registry of IHSS providers to help persons who are eligible for in-home supportive services find providers. A person may work as an IHSS provider without being listed on the Registry. Prior to 2009, any provider who wished to be included on the Registry was required to attend an orientation. Public Authority conducted a provider orientation approximately three times a month in San Diego County. No services to any recipient were provided at the provider orientation. Every orientation included discussion on topics such as safety regulations, wearing gloves, dealing with body fluids, washing hands and preparing food and similar topics. The orientation also included instruction on how to report time, fill out the time sheet, where to submit time sheets, and general payroll processing

46

information.  Being listed on the Registry did not guarantee employment.  A provider did not work in the IHSS program until he or she was hired by a recipient.

5.    *Appellants' disputed evidence concerning the pre-2009 orientation*

Ninety percent of the content of the orientation pertained specifically to the IHSS program. Less than 20 minutes of the orientation was of a vocational nature.  The orientation was completed in one day.  There was an early session, which was applicable only to Registry providers, and a later session, which non-Registry providers could attend.  Public Authority did not inform providers that they would not be paid for attending the mandatory orientation. Woodruff did not know that she would not be paid for attending the orientation until it was over.

6.    *Analysis*

The pre-2009 orientation that is described in the record *appears* to have served several purposes:[26]  It was an information session for persons who were interested in becoming providers; it was part of the required enrollment process for persons who had decided to become providers and wanted to be listed on the Registry; it was required for current providers who wanted to be listed on the Registry; and it provided information about safety precautions and caregiving to both prospective and current providers.[27]

Despite the minimal factual record, there is no issue of material fact with respect to three of the six DLSE criteria that are used to determine whether a training program is outside the

---

[26]    The factual record in this case is not well developed.

[27]    Section 12301.24, which was enacted after the orientation at issue here, clearly indicates that the Legislature intended that the orientation be a part of the enrollment process.  Although the statute does not limit the material presented at the orientation, the information that must be provided focuses on information about the IHSS program, the consequences of committing fraud, fingerprinting requirements, time sheet requirements, and program expectations.

47

coverage of California's minimum wage laws. The uncontroverted evidence shows that the persons attending the orientation did not displace regular employees; that the employer derived no immediate advantage from the activities or presence of the prospective IHSS providers at the orientation; and that the providers were not necessarily entitled to a job once they attended the orientation.

The parties dispute whether the training is for the benefit of the trainees or for the employer. The record shows that all parties benefit from the training. Providers benefit by being listed on the Registry, which may facilitate their being hired by one or more recipients. Public Authority benefits by expanding its provider base and fulfilling its statutory obligation to maintain a Registry for the benefit of the recipients. Recipients benefit by having the opportunity to hire providers who have received at least a minimum amount of training. Because all parties can be said to benefit from the training, this factor is not dispositive.

The parties dispute whether the employer and the trainees understood that the trainees were not entitled to wages for the time spent at the orientation, and whether the material presented was similar to a training that would be given in a vocational school. While Woodruff said that she did not learn that she would not be compensated for attending the orientation until it was over, there is no evidence that Public Authority ever represented that an interested person *would be* compensated for attending an orientation.

With respect to whether "the training, even though it includes actual operation of the employer's facility, is similar to that which would be given in a vocational school," the parties do not dispute that every orientation includes topics such as safety regulations, wearing gloves, dealing with body fluids, washing hands and preparing food and similar topics, and how to report time, fill out and submit time sheets, and general payroll processing information. Appellants

48

claim that 90 percent of the content of the pre-2009 orientation pertained specifically to the IHSS program, and was not the type of information that would have been presented in a vocational school. However, the uncontroverted evidence shows that the purpose of the orientation was to explain the IHSS program to prospective providers, and to ensure that providers who are listed on the Registry have a basic understanding of how to safely care for a recipient. Information about how to safely care for a disabled person is similar to information that would be presented at a vocational school, such as a community college class or nursing school. As a practical matter, the rest of the presentation would necessarily explain the IHSS program, the enrollment process, and the respective responsibilities of the provider, the recipient and the public authority. Thus, even if 90 percent of the program was focused on the IHSS program, this is information that would be helpful for the prospective provider in the event that he or she *chose* to be listed on the Registry for prospective employment by one or more recipients.

Considering the totality of the circumstances, we conclude that the trial court did not err when it determined that Appellants are not entitled to be paid for attending a pre-2009 orientation and granted Public Authority's motion for summary adjudication.

VI

THE COURT PROPERLY EXCLUDED EVIDENCE OF APPELLANTS' TRAVEL TIME
BETWEEN RECIPIENTS' HOMES

Appellants argue that the trial court erred when it excluded evidence of "non-commute travel between recipients' homes." Relying on *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575 (*Morillion*), Appellants contend that their travel time between recipients' homes constitutes "hours worked," and is therefore subject to minimum wage requirements. " 'Hours worked' means the time during which an employee is subject to the control of an employer, and includes

all the time the employee is suffered or permitted to work, whether or not required to do so."
(Cal. Code Regs., tit. 8, § 11150, subd. (2)(H).)

Appellants' reliance on *Morillion* is misplaced. In that case, the California Supreme Court held that an employer that requires its employees to travel to a work site on its buses must compensate the employees for their time spent traveling on those buses. The court determined that this compulsory travel time was compensable because the company directed and commanded its employees to travel between a designated departure point and the company's agricultural fields on company buses. The employees were under the company's control while they were on the buses, within the meaning of the wage order, and their time spent on the buses therefore constituted " 'hours worked.' " (*Morillion*, *supra*, 22 Cal.4th at p. 587.) The *Morillion* court cautioned, "This conclusion should not be construed as holding that all travel time to and from work, rather than compulsory travel time as defined above, is compensable." (*Id*. at p. 587.) Employees who commute on their own have more flexibility than those who are required to report to a certain location at a certain time for transportation to the job site by company bus. Thus, "[t]he level of the employer's control over its employees, rather than the mere fact that the employer requires the employees' activity, is determinative." (*Ibid*.)

Public Authority does not exercise the level of control over providers' travel time between recipients' homes that would bring that time within the definition of "hours worked" under *Morillion*. Public Authority does not direct and control the providers' transportation to and from the recipients' homes. It does not determine whether the provider works for one recipient or more than one recipient on any given day. A provider may decide that a particular recipient's schedule and/or location would be overly burdensome, and decline to work for that recipient. Unlike the plaintiffs in *Morillion*, a provider has some flexibility in arranging his or her schedule. In

50

addition, a provider may run personal errands while traveling from one site to another. (See *Morillion*, *supra*, 22 Cal.4th at p. 587 [citing ability to run errands during an employee's commute as indicative of an employer's lack of control over the employee's time].)

We conclude that the trial court did not err when it determined that Appellants' travel time between recipients' homes does not constitute "hours worked" within the meaning of wage order No. 4 and excluded evidence of such travel time.

VII

JURY INSTRUCTIONS AND SPECIAL VERDICT FORM

1.      *Factual and procedural background*

Public Authority proposed a jury instruction stating that an IHSS provider is entitled to compensation only as expressly provided by statute, regardless of the extent of services rendered, arguing that if the service was not authorized, then the time spent providing that service is not compensable.

Appellants objected to the proposed instruction on the ground that giving such an instruction would implicitly mean that the trial court was ruling that the minimum wage law could be superseded by the rules governing the IHSS program. Appellants asked the court to instruct the jury that a provider is entitled to be paid minimum wage for every hour worked while under the control of the employer, including "all the time the employee is suffered or permitted to work, whether or not required to do so." (Cal. Code Regs., tit. 8, § 11150, subd. (2)(H).) (*Morillion* instruction.)

In response, Public Authority argued that there is an infinite variety of tasks that people could perform for disabled recipients that are not authorized by statute, and that the Legislature had authorized only certain services for needy persons under certain conditions. If providers were

providing services that were not statutorily authorized, they would not be compensated for those services.

The trial court rejected the plaintiffs' proposed *Morillion* instruction. The court instructed the jury that the purpose of the IHSS program was to provide supportive services to enable eligible recipients to safely remain in their homes. The trial court then defined supportive services to include domestic services, services related to domestic services, heavy cleaning, personal care services, accompanying recipients to health care appointments, and protective services,[28] and read to the jury the statute that defines personal care services.[29] (§ 12300.1.) The trial court then instructed the jury: "Only those services that I have described as supportive services are authorized for payment through the IHSS program." The court further instructed the jury that each plaintiff was required to prove that she had been "paid less than the minimum wage . . . for some or all hours worked" and that "the services performed during the unpaid work hours were authorized services as defined in these instructions."

---

[28]    Section 12300 states that "providers shall be paid only for the following: [¶] (1) Services related to domestic services. [¶] (2) Personal care services. [¶] (3) Accompaniment by a provider when needed during necessary travel to health-related appointments or to alternative resource sites. [¶] (4) Protective supervision only as needed because of the functional limitations of the child. [¶] (5) Paramedical services." "Paramedical services include the administration of medications, puncturing the skin or inserting a medical device into a body orifice, activities requiring sterile procedures, or other activities requiring judgment based on training given by a licensed health care professional." (§ 12300.1.)

[29]    Personal care services means assistance with ambulation; bathing, oral hygiene, and grooming; dressing; care and assistance with prosthetic devices; bowel, bladder and menstrual care; repositioning, skin care, range of motion exercises, and transfers; feeding and assurance of adequate fluid intake; respiration; and assistance with self-administration of medications. (§ 12300, subd. (c).)

52

2.   *The parties' contentions on appeal*

Appellants contend that under wage order No. 15 and *Morillion*, they are entitled to be paid for every "hour worked" performing statutorily authorized services.  They argue that Public Authority impermissibly reduced the hours that they had worked performing authorized services when a recipient died or was hospitalized, or as a result of the application of the 60 percent rule.  Appellants also contend that Woodruff was entitled to be compensated for the hours that she had spent waiting to perform authorized services for a dying client, and that St. Germaine was entitled to be paid for the hours that she had spent caring for her client's service dog, as a service "related to domestic services" under section 12300, subdivision (e)(1).

Public Authority contends that it is authorized to pay for only those services that are expressly described in section 12300 et seq. (authorized services) *and* that have also been approved by the social worker for that particular recipient (approved services), and maintains that the broader provisions of the wage and hour laws and regulations requiring payment for every "hour worked" do not apply.  Public Authority acknowledges that a provider is entitled to be paid for all hours that the provider worked for a recipient, but argues that the recipient, and not Public Authority, is responsible for paying the provider for the time that the provider spent performing nonauthorized services for the recipient.  Public Authority characterizes the time that Woodruff spent with Lucille between performing services that had been authorized by the social worker as "protective supervision," which, although a statutorily authorized service, was not approved by the social worker in Lucille's case.  Public Authority asserts that caring for a service dog is not an authorized service under the IHSS program.  Public Authority does not address Appellants' arguments concerning their unpaid wages for authorized services that were retroactively reduced.

53

3.      *Standard of review*

The reviewing court determines whether a jury instruction correctly states the law under the independent or de novo standard of review. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) The reviewing court must consider the instructions as a whole and assume that the jurors are capable of understanding and correlating all the jury instructions which were given. (*Ibid.*) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*Ibid.*)

A failure to properly instruct a jury is not necessarily prejudicial. "A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.) To determine whether the jury instruction was prejudicial, we do not view "the evidence in the light most favorable to the successful defendant and draw all inferences in favor of the judgment. Rather, we must assume that the jury, had it been given proper instructions, might have drawn different inferences more favorable to the losing [party] and rendered a verdict in [that party's] favor on those issues as to which it was misdirected. [Citations.]" (*Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1156.) In doing so, we assess: "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule,* at pp. 580-581, citing *LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 875-876 and *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069.)

4.      *De novo review of jury instruction*

Statutory provisions authorizing the regulation of wages, hours and working conditions are to be liberally construed to promote the protection and benefit of employees.  (*Martinez, supra,* 49 Cal.4th at p. 61.)  Wage order No. 15 defines " '[h]ours worked' " as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so."  (Cal. Code Regs., tit. 8, § 11150, subd. (2)(H).)  "[T]he phrase 'suffered or permitted to work, whether or not required to do so' [citation] encompasses a meaning distinct from merely 'working.'  (*Morillion*, *supra*, 22 Cal.4th at p. 584.)  The most significant factor in determining whether the employee's activities constitute " 'hours worked' " is "[t]he level of the employer's control over its employees . . . ." (*Morillion,* at p. 587; see *McCune*, *supra*, 894 F.2d at p. 1111 [under federal law, IHSS workers must be compensated for all hours that the state suffers or permits to be worked]; see also *Aguilar v. Association for Retarded Citizens* (1991) 234 Cal.App.3d 21 [employer was required to pay employees who worked less than 24-hour shifts for all hours employees were subject to employer's control, including the hours when the employees were allowed to sleep].)

An employee may be under the employer's control when the employee is waiting to perform work, even though he or she is not actually working.  If the time is not long enough to free the employee to use the time as he or she wishes, then the time constitutes "hours worked." For example, the time spent by " '[a] stenographer who reads a book while waiting for dictation, a messenger who works a crossword puzzle while awaiting assignments, [a] fireman who plays checkers while waiting for alarms and a factory worker who talks to his fellow employees while

55

waiting for machinery to be repaired' " constitutes "hours worked" under the FLSA.[30] (*United Transp. Union Local 1745 v. City of Albuquerque* (10th Cir. 1999) 178 F.3d 1109, 1117.)

Under the IHSS statutory scheme, the recipient retains the right to supervise a provider who is providing services to the recipient. (§ 12301.6, subd. (c)(1).) However, this right is to be exercised within the parameters of the social worker's assessment of the authorized services that the recipient requires to safely remain in his or her own home. Any rules for the use of those hours may be established and explicitly communicated to the recipient and his or her providers by the public authority as an employer. (§ 12300.2 [recipient receives "a description of each specific task authorized and the number of hours allotted"]; see *McCune*, *supra*, 894 F.2d at pp. 1111-1112.) The recipient is responsible for setting a provider's work schedule and coordinating the provider's hours with other IHSS providers and/or caregivers within the authorized service hour limits. When it has been determined that a provider has received an overpayment, the director or the county may, to the extent permissible under existing labor laws, recover the overpayment through procedures that comport with applicable due process requirements. (§ 12305.83; see also § 12305.82 [authority to investigate fraud in the provision or receipt of in-home supportive services].)

Thus, a provider of IHSS is entitled to be compensated for every hour that he or she is subject to the control of an employer, whether the employer in question is the recipient or Public Authority, within the limit of the number of hours authorized by the social worker for delivery of

---

[30]     The FLSA " 'explicitly permits greater employee protection under state law.' " (*United Parcel Service Wage & Hours Cases, supra,* 190 Cal.App.4th at p. 1010, quoting *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 795.) "In many respects, California law provides broader protection of employee rights, and in such instances, California law controls." (*United Parcel Service Wage & Hours Cases,* at p. 1010.)

services to the recipient. This includes all of the time during which the employee is suffered or permitted to work, whether or not required to work.[31] (Cal. Code Regs., tit. 8, § 11150, subd. (2)(H).) Further, where the authorized services necessitate some waiting time on the part of the provider because of the recipient's condition, such as repositioning an immobile client, feeding, assuring adequate fluid intake, bathing, grooming and oral hygiene, dressing, respiration, bowel and bladder care, or pain relief, the waiting time constitutes "hours worked" under *Morillion* and wage order No. 15. If Public Authority has reason to believe that it has paid for unauthorized services, it may seek to recover the overpayment (or investigate suspected fraud) under the provisions of section 12305.83 (or 12305.82). Finally, Public Authority's practice of retroactively reducing a recipient's assessed hours and then not paying a provider for the hours that he or she had already worked violates federal and state wage and hour laws. (See Labor Code, §§ 510, 1194; Cal. Code Regs., tit. 8, §§ 11040, subd. 4, 11150, subd. 4; 29 U.S.C. §§ 206, 216; see also *Armenta v. Osmose, Inc*., *supra*, 135 Cal.App.4th at p. 324 ["California's labor statutes reflect a strong public policy in favor of full payment of wages for all hours worked."].)

We conclude that the trial court did not fully and fairly instruct the jury on the applicable law. (*People v. Ramos, supra*, 163 Cal.App.4th at p. 1088.) The court should have instructed the jury that: (1) " 'Hours worked' " is "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." (Cal. Code Regs., tit. 8, § 11150, subd. (2)(H).) (2) Time spent waiting to perform authorized services is compensable under federal and state wage and hour laws. (See

---

31    We emphasize that we do not extend our conclusions to a provider of IHSS who is living or staying in the recipient's home. Those circumstances involve the application of wage order provisions that are not applicable here. (See, e.g., Cal. Code Regs., tit. 8, § 11150, subd. (3).)

*Morillion*, *supra*, 22 Cal.4th at p. 587; *McCune*, *supra*, 894 F.2d at p. 1111; 29 C.F.R. § 785.16.)

(3) Where a provider delivers services other than those authorized and covered by the program, or for a greater number of hours than authorized, and the county or public authority has no knowledge that such is occurring and is realistically unable to ascertain the unauthorized use, or the public authority has provided explicit instructions to the provider and recipient of rules for the use of those authorized hours, the public authority does not have to pay the provider for such services. (See *Guerrero*, *supra*, 213 Cal.App.4th at p. 944.) The trial court's limiting compensable time to time spent actually performing authorized services and its omission of these provisions of applicable wage laws rendered the jury instructions at issue erroneous as a matter of law.

5. *There was instructional error with respect to retroaction reduction of hours*

The evidence is uncontroverted that Public Authority retroactively reduced the number of approved hours for a recipient if the hours that the provider worked during the first half of a month exceeded 60 percent of the total approved monthly hours, or when a recipient died, was hospitalized or institutionalized, or the recipient's needs changed during the month, regardless of the number of hours that a provider had already worked performing authorized and approved services. The record does not show that Public Authority explicitly communicated its 60 percent rule to providers and recipients.[32] Woodruff testified that during the time that her client Lucille was dying, she worked 72 hours but was paid for only 35 hours. The social worker told Woodruff that her hours were retroactively reduced when the recipient died. Baptiste said that because of the retroactive reduction in hours for two of her clients, she was not paid for 40 hours

_____

[32] As mentioned *ante*, the retroactive reduction rule violates state and federal wage and hour laws.

that she had spent performing authorized services. Similarly, St. Germaine testified that she was not paid for a total of 25 hours that she had spent performing authorized services.

During closing argument, Public Authority informed the jury that wait-around time" or "sit-around time" was not authorized. It argued that some of the services that Woodruff had provided in caring for her dying client had not been authorized by the social worker, including rubbing the recipient's skin, repositioning her, maintaining her range of motion, and providing protective supervision. With the exception of the service dog claim, Public Authority did not assert that Baptiste and St. Germaine were seeking compensation for performing unauthorized services for their clients, but instead argued that their hours had been incorrectly reported on their time sheets.

If the jury had been properly instructed on the law, it might have drawn inferences that were more favorable to the plaintiffs. (*Logacz v. Limansky*, *supra*, 71 Cal.App.4th at p. 1156.) For example, the record shows that Woodruff testified that she was not paid for 37 hours and that Public Authority told her that this was because the hours that Woodruff spent caring for Lucille were retroactively reduced. A properly instructed jury could determine that Woodruff was working as directed by an employer while she sat by Lucille's bedside and monitored her condition, including respiration, hydration, pain relief, and other authorized services. A jury could further conclude that Public Authority violated wage and hour laws when it retroactively reduced the number of authorized hours and did not pay Appellants for every hour that they had spent performing authorized services.

6.    *There was no instructional error with respect to the service dog*

The trial court did not err when it excluded the time that St. Germaine spent caring for her client's service dog from the description of authorized services in the jury instructions. Although

59

Appellants' public policy argument regarding the benefits of maintaining service dogs for a disabled recipient has merit, there is no provision under the IHSS scheme that permits direct payment to a provider for the care and maintenance of a recipient's service dog. (See §§ 12300, 12300.1, 14132.95.) Instead, the Legislature directs that eligible recipients who have guide dogs, signal dogs, or other service dogs may receive a recurring special need allowance to pay for dog food *and other costs associated with the dog's care and maintenance*. (§§ 12550, 12553, subd. (a), 12554, subd. (a).) In order to receive the special allowance, the recipient or, if the recipient is incapable, another person such as a relative, a close personal friend, or a representative of a public agency with knowledge of the recipient's services, is required to complete the application for a special service dog allowance. (§§ 11054, 12553, 12554.) Once approved, the recipient receives a monthly warrant for the special allowance. (§§ 12553, 12554.)

In enacting sections 12553 and 12554, the Legislature has explicitly recognized that a recipient benefits from having a service dog. It did not, however, include the care and maintenance of service dogs in the list of authorized services under the IHSS program. (§§ 12300, 12300.1.) Instead, payment is made directly to the recipient upon separate application for assistance. (§§ 12300, 12553, 12554.) Thus, St. Germaine is not entitled to IHSS compensation under sections 12300 or 12300.1 for caring for her client's service dog and the trial court's exclusion of the time spent caring for the service dog in the jury instructions was not error.

VIII

DISPOSITION

The order sustaining the demurrer without leave to amend on Appellants' claim for overtime and compensation for expenses incurred by an employee in direct consequence of the discharge of his or her duties is reversed. The order denying Appellants' motion for leave to

60

amend the complaint with claims for compensation and reimbursement for complying with section 12301.24 is affirmed as to the claim for wages for time spent reviewing written materials and reversed as to the claim for wages for attending the 2009 orientation and completing the enrollment process. The order granting Public Authority's motion for summary adjudication on the issue of compensation for attending a pre-2009 orientation is affirmed.

The trial court erred when it refused Appellants' special instruction on the definition of "hours worked," and the error resulted in prejudice on the claim for payment of retroactively reduced hours. Accordingly, the judgment is reversed. Parties to bear their own costs.


AARON, J.

WE CONCUR:


HALLER, Acting P. J.


IRION, J.